M. BRYCE & ASSOCIATES, INC., a foreign corporation, Plaintiff-Respondent,

v.

William GLADSTONE and Rodney Lang, d/b/a Arthur Young & Co., and Harley-Davidson Motor Co., Inc.—Subsidiary AMF Incorporated, Defendants-Appellants.

Harry D. MAYO, III, and John E. Chapel, Defendants.†

Court of Appeals

*No. 80–1935. Argued December 15, 1981.—Decided March 26, 1982.*
(Also reported in 319 N.W.2d 907.)

† Petition to review denied.

242

For the defendants-appellants there were briefs by *Thomas O. Kloehn* and *Patricia K. Ballman* of *Quarles & Brady*, of Milwaukee, and for the defendant-appellant Arthur Young & Co. by *Carl D. Liggio, John Matson* and *Eugene R. Erbstoesser*, and oral argument by *Eugene R. Erbstoesser*, all of New York.

For the plaintiff-respondent there was a brief by *Andrew O. Riteris, John L. Beard* and *Kevin P. Reak* of *Michael, Best & Friedrich* and *Jack L. Goodsitt* of *Goodsitt & Goodsitt*, of counsel, and oral argument by *Andrew O. Riteris*, all of Milwaukee.

Before Decker, C.J., Moser, P.J., and Randa, J.

RANDA, J. The plaintiff, M. Bryce & Associates, Inc. (MBA), contends that the defendants, Arthur Young & Co. (Young) and Harley-Davidson Motor Co., Inc. (Harley-Davidson), took and used for their own benefit MBA's "trade secret" contained in a methodology for the design of management information systems—PRIDE (*PR*ofitable *I*nformation by *DE*sign). The jury returned a verdict in favor of MBA and the trial court entered judgment against Young and Harley-Davidson. We affirm.

In May, 1974, Young agreed to assist Harley-Davidson in revamping its internal operating systems. One of the projects was to design a management information systems standards manual (MIS). Harry Mayo (Mayo),

Young's employee, and John Chapel (Chapel), Harley-Davidson's employee, were assigned to this project. Both were experienced in MIS design. They began their work in May, 1974.

In June, 1974, Gerald Myers (Myers), a Harley-Davidson employee, suggested that one of the commercially available MIS methodologies, PRIDE, marketed by MBA, be considered. On June 19, 1974, Mayo called Milton Bryce, MBA's president, and arranged for a sales presentation at Harley-Davidson on July 2, 1974.

The demonstration of PRIDE lasted approximately one full day. During the morning session, Bryce explained in general terms what PRIDE could accomplish and how it could benefit the business. Before going into the details of PRIDE at the afternoon session, Bryce required all participants to sign a non-disclosure form. Present at this time were Mayo of Young, and Chapel, Myers, Beach and Bryan of Harley-Davidson. Only Mayo, Bryan and Chapel signed this form. Nonetheless, Bryce continued with the afternoon session with the non-signers present.

After the afternoon presentation, employees of both Young and Harley-Davidson were impressed with the PRIDE system. During the next week Young and Harley-Davidson discussed whether Harley-Davidson should purchase PRIDE or stay with the work of Chapel and Mayo. A decision was made not to purchase PRIDE. The reason given for this decision was that PRIDE was not an economical choice in light of the time and effort already invested by Mayo for which Harley-Davidson still would have to reimburse Young.

Mayo and Chapel continued their work on MIS. The final version of their draft manual was submitted in August, 1974. Certain Harley-Davidson personnel were unhappy with the draft and requested changes that were needed to be made. The project was concluded in mid-October, 1974.

Subsequent to the submission of their draft, Mayo and Chapel learned that an independent standards drafting team had been set up at Harley-Davidson and was headed by Stuart Moebus (Moebus). In October, 1974, the Mayo and Chapel version of the manual was given to Moebus who revised it based on his team's independent work. The Harley-Davidson manual was issued in final draft form on January 10, 1975.

MBA filed its complaint in 1975 contending that Young and Harley-Davidson through their agents and employees, Mayo and Chapel, used the information disclosed on July 2, 1974, to duplicate, copy, appropriate and reproduce PRIDE without authorization, license or right, in substantially the same or identical form. MBA requested a permanent injunction and an award of compensatory damages.

Young filed a supplemental counterclaim for declaratory relief alleging there was no trade secret in PRIDE and that MBA did not own its supposed secret because MBA copied the methodology of Bryce's prior employer, Tek-Fax. MBA denied the allegations and asserted the affirmative defense that Young was estopped to attack PRIDE's trade secret status because its employee had signed a non-disclosure form for PRIDE.

Young and Harley-Davidson's motion for summary judgment on the ground that MBA's voluntary election of a federal copyright in the PRIDE manuals precluded any trade secret claim was denied. Young and Harley-Davidson's motion for summary judgment on the ground that the admissions of MBA and its expert witness indisputedly showed that the PRIDE "secret" was not taken or used by Young or Harley-Davidson was also denied. Young and Harley-Davidson successfully moved to strike MBA's affirmative defense of estoppel concerning the supplemental counterclaim. Before the trial court instructed the jury, Young and Harley-Davidson agreed to assume responsibility for all the acts of Chapel and

Mayo, and the action against Chapel and Mayo was dismissed.

At the close of the evidence, the case was submitted to the jury on a nine-question special verdict.[1] Questions

---

**SPECIAL VERDICT**

QUESTION NO. 1:

At the time of the sales presentation of July 2, 1974, did the plaintiff M. Bryce & Associates have a trade secret in any of the following respects:

    A) In the three volumes of "PRIDE" together with M. Bryce's presentation of July 2, 1974?
       Answer: Yes
    B) The Data Management Section of "PRIDE"?
       Answer: Yes

QUESTION NO. 2:

If you answer "No" to all of the subdivisions of Question No. 1, then do not answer Question Nos. 2 and 3, and go to Question No. 4.

If you answer any part of Question No. 1 "Yes" then answer the following question:

Was the trade secret found by you in Question No. 1 disclosed in a confidential relationship to the defendants at the sales presentation of July 2, 1974?

       Answer: Yes

QUESTION NO. 3:

If you answer Question No. 2 "Yes" then answer the following question:

Did one or both of the following defendants use the trade secret found by you:

    A) Arthur Young?
       Answer: Yes
    B) Harley-Davidson?
       Answer: Yes

QUESTION NO. 4:

Did one or both of the defendants named below sign the Non-Disclosure Agreement on July 2, 1974:

    A) Arthur Young?
       ANSWERED BY THE COURT: Yes
    B) Harley-Davidson?
       ANSWERED BY THE COURT: Yes

1, 2, 3, and 8 pertained to the "alleged" trade secret and questions 4, 5, 6, and 9 pertained to the non-disclosure agreement. In summary, the jury concluded that (i) MBA had a trade secret; (ii) the trade secret was disclosed in a confidential relationship; (iii) the trade secret was used by both Young and Harley-Davidson;

QUESTION NO. 5:
Was the information disclosed at the presentation after the signing of the Non-Disclosure Agreement of July 2, 1974, proprietary (secret and confidential)?

   Answer: Yes

QUESTION NO. 6:
If you answer Question No. 5 "Yes" then answer this question:
Was the proprietary (secret and confidential) information found by you in Question No. 5 used by one or both of the following defendants:

   A) Arthur Young?
      Answer: Yes
   B) Harley-Davidson?
      Answer: Yes

QUESTION NO. 7:
What sum of money will fairly and reasonably compensate the plaintiff for damages they sustained because of the use of the trade secret and/or proprietary (secret or confidential) information as found by you?

   ANSWERED BY COURT: $10,000.00

QUESTION NO. 8:
If you answer Question No. 1 "Yes" then answer this question:
Was the trade secret found by you in answer to Question No. 1 in fact developed by TekFax and appropriated by M. Bryce and Associates?

   Answer: No

QUESTION NO. 9:
If you answer Question No. 5 "Yes" then answer this question:
Was the proprietary (confidential and secret) information found by you in answer to Question No. 5 in fact developed by TekFax and appropriated by M. Bryce and Associates?

   Answer: No

and (iv) the trade secret had not been appropriated by MBA from Tek-Fax. The trial court entered judgment for MBA.

Motions after verdict by Young and Harley-Davidson were filed, briefed, and denied in a 35-page opinion by the trial court. This appeal by Young and Harley-Davidson followed. The following issues are raised on appeal:

1. Did MBA have a trade secret in the three volumes of PRIDE together with Bryce's presentation of July 2, 1974, and the Data Management Section of "PRIDE"?
2. Is there credible evidence to support the jury's finding that Young and Harley-Davidson used MBA's trade secret?
3. Did MBA's voluntary use of a copyright notice on the PRIDE manual prevent the state of Wisconsin from applying its trade secret law to bar use by others of the information contained in the work?
4. Is there credible evidence to support the jury's finding that MBA's trade secret was not developed by Tek-Fax and appropriated by MBA?
5. When employees Chapel and Mayo were dismissed from the case pursuant to an agreement between counsel and the trial court that employers Young and Harley-Davidson were responsible for their employees' acts, were the employers discharged by operation of law?

## I. EXISTENCE OF A TRADE SECRET

In *Abbott Laboratories v. Norse Chemical Corp.*, 33 Wis. 2d 445, 147 N.W.2d 529 (1967), our supreme court considered the following six factors as being relevant in determining whether the material sought to be protected is a trade secret:

". . . Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of

his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* at 463–64, 147 N.W.2d at 538–39 (quoting Restatement (First) of Torts § 757, comment b (1939)).

The question of whether the evidence in this case fulfills the criteria necessary to constitute a trade secret is a question of law. *Department of Revenue v. Exxon Corp.,* 90 Wis. 2d 700, 713, 281 N.W.2d 94, 101 (1979), *aff'd,* 447 U.S. 207 (1980). As to questions of law, this court need not give special deference to the trial court's determination. *First National Leasing Corp. v. City of Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

After the jury returned their verdict, the trial court reviewed the evidence and stated its reasons for sustaining the jury's verdict. As to the six factors enumerated in *Abbott,* the trial court found the following facts in support of those six factors:

1) The extent to which the information is known outside of the plaintiff's business is supported by the following evidence:

The people involved in the afternoon session and those involved in the preparation of the standards manual for Harley-Davidson all were impressed with the "PRIDE" material and the information given at the afternoon session to such a degree that one of the defendants himself, "an expert," was willing to pay the $10,000.00 for information. This, inferentially, attests to the fact that the concept was not known; the testimony of Bryce concerning the method in which he protected the confidentiality from getting outside his business; the fact that the prod-

uct is never sold without the expressed agreement to maintain confidentiality.

The defendants have in a very thorough manner gone over the material presented in the sale literature and the "state of the art" at the time of the misappropriation and argue that all or any trade secret was known or spelled out by the plaintiff in a public advertisement (Plaintiff's Exhibit 201 and 219). This evidence was presented to the jury. The evidence the jury could have believed was that demonstrated to them, the actual portraying of the methodology in the specific case study and the detailed unique uses of the generally known components. Those advertisements could have been interpreted by the jury to define the "what" of "PRIDE" but certainly not the *"how"* and "why" which they found the defendants heard and saw and used.

2) The extent to which it is known by employees and others involved in his business. Here again, Mr. Bryce's testimony is sufficient for the jury to draw reasonable inferences that all employees were informed of the confidential nature of the material with the pledge of keeping it secret.

3) The extent or measures taken by him to guard the secrecy of the information; the signing of the Non-Disclosure Agreement by every person that was at a sales meeting where a secret portion of the sales presentation was made; the testimony concerning Bordens, the fact that their employee was cognizant of the pledge of secrecy; the testimony concerning the July 2, 1974, meeting relating to signing the agreement and the oral warnings; and while one of the parties is alleged not to have signed the agreement, there is evidence that that party was on notice orally. The documents themselves say it. Bryce referred to secrecy a number of times during his presentation. All is sufficient evidence to support a conclusion that that factor was covered.

4) The value of the information to him and to his competitors is supported by the amounts paid for the product and the fact that many knowledgeable people at Harley-Davidson and Arthur Young found it valuable.

5) The amount of effort or money expended by him in developing the information system. The record is replete with evidence, the number of days that he spent

in drafting the documents, his wife's work, the efforts in upgrading it and keeping it current to society's needs.

6) The ease or difficulty with which the information could be properly acquire [sic] or duplicated by others. There was a search for a methodology by Dr. DuBois, by Arthur Young, Harry Mayo. There is the cost that was made by Harley-Davidson to develop a manual. Generally the list of "PRIDE" customers shows the cost and inferentially the difficulty or ease with which an information system would be created, let alone a system that was so highly specialized. The jury could draw the inference that because these experts recognized this as a unique contribution, that experienced persons in the data processing industry would have difficulty in acquiring the concepts and implement them as they were done in "PRIDE."

After a thorough review of the record, we agree with the trial court's conclusion that all six factors stated in *Abbott* are sufficiently supported by the evidence. Since the evidence in this case fulfills the criteria necessary to constitute a trade secret, we conclude that, as a matter of law, a trade secret existed.

## II.  USE OF A TRADE SECRET

Young and Harley-Davidson contend that in order for the jury to have found "use" by Young or Harley-Davidson of MBA's trade secret, Young or Harley-Davidson must be found to have "precisely duplicated" or "copied" MBA's trade secret. We disagree.

Our supreme court has concluded that sec. 757 of Restatement (First) of Torts (1939) is the correct statement of the general law of trade secrets. *Abbott, supra,* 33 Wis. 2d at 456, 147 N.W.2d at 534. The trial court, in instructing the jury as to a "use" of a trade secret,

quoted directly from comment *c* of sec. 757. The trial court said:

> To subject a person to liability for use of another's trade secret, there is no requirement that he use it exactly in the form that he received it. He may be liable even if [he] uses it with modification—modifications or improvements upon it affected by his own efforts.
>
> Differences in detail do not preclude liability if substantially the process used by the actor is derived from the other's secret in breach of a relationship of trust and confidence.
>
> The liability is avoided only when the contribution by the other's secret is so slight that the actor's process can be said to be derived from other sources.

We conclude that the trial court's instruction is a correct statement of the law in this area.

The jury found that both Young and Harley-Davidson used MBA's trade secret. The jury's verdict had the approval of the trial court.

On appeal, we will view the evidence in a light most favorable to the verdict and sustain the verdict if there is any credible evidence to support it. *Coryell v. Conn,* 88 Wis. 2d 310, 315, 276 N.W.2d 723, 727 (1979). The jury's decision is entitled to even greater weight on appeal, where, as here, the verdict has the approval of the trial court. *Meurer v. ITT General Controls,* 90 Wis. 2d 438, 450, 280 N.W.2d 156, 162 (1979).

After a review of the record, we agree with the trial court's conclusion that the jury verdict is sustained by the credible evidence. Specifically the trial court found:

> Here the testimony of Dr. DuBois and Dr. Heintz both identify similarities. The exhibits used by Dr. DuBois and the testimony of Mr. Bryce could have been related by the jury to identify the use of the trade secret. Dr. Heintz said, "although not identical, very similar" as he talked of the procedures and techniques which are the

trade secret. Heintz leaves the question of the violation of the proprietary nature of "PRIDE" to the jury. Then he suggested that if it were a copying that went into the preparation that he would have to know the experience of the persons, their prior knowledge and the work papers that form the foundation in the preparation of the manual.

There is testimony of similarities in the work papers that relate to periods after June 26th and after July 2nd. There is Bryce's testimony; Mayo's testimony; a reference in the log of John Chapel dated July 16, 1974, concerning Dave Bryan's contribution; the comparison made by Dr. DuBois in the arrow charts, Exhibit 225, which illustrates the comparison of the Data Management Section of "PRIDE" and the forms taken from Harley-Davidson's manual; Dr. DuBois's reference to the real use of the subsystem concept in the implementation of the Harley-Davidson information system. Finally, there is the accidental use of the word "subsystems" by Harley-Davidson in the work papers and the motive of getting the Harley-Davidson manual out as quickly as possible.

## III.  COPYRIGHT LAW

Because the events in this case occurred prior to January 1, 1978, when a complete revision of the Copyright Act of 1909 took effect, this case is governed by the Copyright Act of 1909.[2] Under the 1909 Act, "publication" was the central, operative feature of the copyright law. *See generally* 1 M. Nimmer, Nimmer on Copyright § 4.01 (1981). State common-law copyright existed only until the first publication of the work. *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346–47 (1908). Federal statutory protection was secured by publishing the work with the appropriate copyright notice. 17 U.S.C. § 10. If the work was published without notice, in most cases the work would irretrievably enter the public domain.

---

[2] All citations are to the 1970 version of Title 17 of the United States Code unless otherwise indicated.

*Bobbs-Merrill Co. v. Straus, supra,* 210 U.S. at 347. The importance of "publication" gave rise to a considerable body of cases deciding whether a work had been "published" in particular circumstances. *See* 1 Nimmer on Copyright, *supra,* at § 4.04.

In order to mitigate the harsh rule that publication divests common-law rights, courts evolved a distinction between a "general publication" and a "limited publication." Only a general publication would divest common-law rights. *Masterson v. McCroskie,* 556 P.2d 1231, 1233 (Colo. App. 1976).

A limited publication has been held to be a publication "which communicates the contents of a manuscript to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale . . . ." *White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir. 1952). Both persons and use must be restricted.

In compliance with 17 U.S.C. § 19, MBA placed a copyright notice, the publication date of 1971 and/or 1973, and the identification of MBA as the copyright holder on all its PRIDE manuals and forms. Nevertheless, MBA argues that there was no general publication, notwithstanding its use of the copyright notice.

Bryce testified that customers using PRIDE are allowed unlimited reproduction of PRIDE manuals and forms as long as MBA's copyright notice is included and that MBA cannot account for the number or whereabouts of such copies.[3] When the principal facts and the reason-

---

[3] Mr. Bryce testified as follows:

Q Now, when you sold "PRIDE" beginning in 1971, you have allowed all your purchasers to print their own forms haven't you?

A Yes, sir, as part of our agreement.

Q And all they need to do is put the copyright symbol on it, that is all that is required of them, isn't it?

able inferences are undisputed, as they are here, we are not bound by the findings of the trial court. *State v.*

A No, I think if I remember correctly, in our agreement they have to maintain the copyright and a trade mark of "PRIDE."

Q And you don't know how many of these forms have been printed, do you, by customers?

A No, sir.

Q And you don't know where they have been printed, do you?

A No, sir.

Q And you don't know where all of these forms exist that were printed, do you?

A No, sir.

Q Also your customers are allowed to reprint copies of the M. Bryce & Associates manuals, are they not?

A Yes.

Q And you don't know whether any have been reprinted do you?

A I am sorry, would you repeat that question?

(Whereupon the above pending question was read back by the reporter.)

THE WITNESS: Our manuals have been reprinted by customers.

MR. KLOEHN:

Q You know of some?

A Yes.

Q But you don't know of all of them, do you?

A No, sir.

Q And you don't know where all of the copies are today?

A No, sir.

Q You don't check up on your customers with a careful audit to determine what they are doing with your manuals, do you?

A We do periodically.

Q And how do you conduct this audit?

A We have a form that we send out and we tell them, the manuals we have, our records, and we ask them to account for them.

Q When did you start doing that?

A We did that informally almost from the beginning, but we started to formalize it.

Q By "informal" meaning you called them on the telephone?

A We called them on the phone.

Q Now, you simply signed out a form?

A Our customer base has grown since then.

*Williams,* 104 Wis. 2d 15, 21, 310 N.W.2d 601, 604–05 (1981). We conclude that a general publication occurred in the manner in which MBA disseminated its PRIDE manuals and forms. *See White v. Kimmell, supra,* 193 F.2d at 747.

Further, the limited publication exception arose in circumstances quite different from this case. If the author disseminated his work without a copyright notice and if it was held that a publication had occurred, the author's protection was forfeited. *National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 598 (2d Cir. 1951). Where finding a general publication would divest the author of the benefit of his work, courts have avoided a complete forfeiture by concluding that a limited publication occurred. *Compare Pierce & Bushnell Manuf'g Co. v. Werckmeister,* 72 F. 54 (1st Cir. 1896) (holding that exhibition of a painting in a public art gallery was sufficient publication to entitle plaintiff to recover under the Copyright Act) *with Werckmeister v. American Lithographic Co.,* 134 F. 321 (2d Cir 1904) (holding that exhibition of a painting in a public gallery did not constitute publication divesting plaintiff of his common law protection). Courts were more likely to find a general publication despite less dissemination where the issue was whether a publication was sufficient to invest copyright protection. *Hirshon v. United Artists Corp.,* 243 F.2d 640, 644–45 (D.C. Cir. 1957).

The inquiry here is not whether MBA published the PRIDE manuals and forms without any notice and was thereby divested of all copyright protection. Rather the issue here is whether a publication occurred that would invest a federal copyright in the PRIDE manuals and forms and thus accord MBA federal protection. We conclude that such an investiture occurred.

Having concluded that a general publication occurred, we must determine whether MBA's voluntary use of the

federal copyright notice on PRIDE's manuals and forms prevents the state of Wisconsin from applying its trade secret law to bar use by others of the information contained in the work.

Young and Harley-Davidson contend that MBA by publishing its PRIDE manual and forms have invoked the federal copyright laws, thus limiting their recovery to a federal copyright infringement claim.

Lawyers and the courts have been plagued by the uncertainty of the interplay between state trade secret law and federal copyright protection. *See generally* Diamond, *Preemption of State Law,* 25 Bull. of the Copyright Soc'y of the U.S.A. 204 (1978). This problem is most evident, as is the case here, where a party has marked trade secret documents with a copyright notice and date of publication.

The 1981 ABA Committee Report, Section of Patent, Trademark & Copyright Law, best summarized this conflict as follows:

The conflict in the dual use of state trade secret and federal copyright protection stems from the inherent substantive differences between them. Copyright protection is the manifestation of the constitutional power to extend a limited commercial monopoly to creators in order to promote the general public good through the diffusion of knowledge and the concomitant stimulation of progress and competition in a free society. Copyright protection requires the creator to relinquish, however, all rights save for those reserved and enumerated by the Copyright Act, i.e., the control of copying and reproduction of the work. Copyrighting a work therefore results in its divulgation to the public, including the ideas inherently embodied therein, and the public may make "open and free" use of such material within the strictures of the copyright law.

Conversely, secrecy and non-disclosure are the very essence of state trade secret protection. The creator has a right to perpetual protection of the secret as long as secrecy is maintained, but the risks are substantial.

Trade secret protection evaporates upon any disclosure, whether intentional or inadvertent. Nor is any protection afforded against any independent development of the same secret by another or "reverse engineering" of it. In summary, a choice is offered—an exclusive federal right for a limited time versus an imperfect state law perpetual remedy. 1981 A.B.A. Sec. Pat., Trademark & Copyright L. Rep. 91, 92.

Although we recognize the conflict between state trade secret law and federal copyright law, we conclude that state trade secret protection is not preempted. We reach this conclusion on a number of bases.

    1.  Demarcation between trade secret protection and copyright protection.

The line of demarcation between trade secret and copyright protection is clear. Trade secret law protects content irrespective of form of expression; copyright law protects form of expression but not the underlying ideas. As the United States Supreme Court stated in *Baker v. Selden,* 101 U.S. 99, 103 (1880) :

The copyright of a work on mathematical science cannot give to the author an exclusive right to the methods of operation which he propounds, or to the diagrams which he employs to explain them, so as to prevent an engineer from using them whenever occasion requires. The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book. And where the art it teaches cannot be used without employing the methods and diagrams used to illustrate the book, or such as are similar to them, such methods and diagrams are to be considered as necessary incidents to the art, and given therewith to the public; not given for the purpose of publication in other works explanatory of the art, but for the purpose of practical application.

Trade secret law prohibits unauthorized disclosure or use of protected ideas only by persons who are privy to

the trade secret by reason of some relationship to the owner which legally limits use or disclosure by them. Copyright law prohibits unauthorized copying by anyone of the form of expression in which the ideas are fixed by the author. *Id.* at 105.

If state trade secret protection was preempted by federal copyright law, MBA would have to turn to the federal copyright law for protection. Since copyright protection covers only the form of expression, its value to MBA in protecting MBA's interests would be limited. Only MBA's PRIDE manuals and forms would be protected but not MBA's methodology which is embodied also in the oral presentation by Bryce. We conclude that such a preemption of trade secret law by federal copyright law incapable of providing equivalent protection would disrupt an area of property protection which has been found to be of great value.

2. The 1976 Copyright Act.

The 1976 Copyright Act, the earlier versions of the bill and the hearings on the act, make it clear that Congress has not unmistakenly ordained the preemption of trade secrets.[4]

In order to analyze the bounds of preemption under the 1976 Copyright Act, 17 U.S.C. §§ 102,[5] 103,[6] and 106[7]

[4] Because the 1909 Act does not address the preemption problem, we direct our attention to the 1976 Act as a means of analyzing the federal preemption question. We recognize, however, that this case is governed by the 1909 Act.

[5] § 102. Subject Matter Of Copyright: In General

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(1976) must be considered in conjunction with 17 U.S.C. § 301 (1976).[8] Section 301 requires that in order for

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works; and

(7) sound recordings.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

[6] § 103. Subject Matter Of Copyright: Compilations And Derivative Works

(a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

(b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

[7] § 106. Exclusive Rights In Copyrighted Works

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

[8] § 301. Preemption With Respect To Other Laws

(a) On and after January 1, 1978, all legal or equitable rights

preemption to occur, the following two conditions must coexist: (a) definitions of statutory subject matter of copyright in secs. 102 and 103 are met, and (b) rights equivalent to the exclusive rights of copyright as defined in sec. 106 are violated.

The most troublesome question of preemption is the second condition—whether an "equivalent right" has been violated. The predecessor bill included the following examples of exceptions to preemption in sec. 301(b) (3) :

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within

that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or

(2) any cause of action arising from undertaking commenced before January 1, 1978; or

(3) *activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.*

(c) With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2047. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2047. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2047.

(d) Nothing in this title annuls or limits any rights or remedies under any other Federal statute. [Emphasis added.]

the general scope of copyright as specified by section 106, including rights against misappropriation not equivalent to any of such exclusive rights, breaches of contract, breaches of trust, trespass, conversion, invasion of privacy, defamation, and deception [sic] trade practices such as passing off and false representation; or S. Rep. No. 473, 94th Cong., 1st Sess. 20 (1975).

The hearings on this bill state that these examples:

are intended to illustrate rights and remedies that are different in nature from the rights comprised in a copyright and that may continue to be protected under State common law or statute. The evolving common law rights of "privacy," "publicity," and *trade secrets*, and the general laws of defamation and fraud, would remain unaffected as long as the causes of action contain elements, such as an invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement. H.R. Rep. No. 1476, 94th Cong., 2d Sess. 132 (1976). [Emphasis added.]

Congress, rather than clearly stating its intent from a positive viewpoint, approached the preemption question from the negative side by providing examples of when preemption would not be found.

This intent is further complicated by the absence from the 1976 Act of those examples which were included in the final draft. This deletion was preceded by a discussion among three congressmen. They agreed that the examples should be deleted but seemed to differ on whether this action was to limit or expand preemption. 122 Cong. Rec. H32015 (daily ed. Sept. 22, 1976).[9]

---

[9] AMENDMENT OFFERED BY MR. SEIBERLING

MR. SEIBERLING. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. Seiberling: Page 127, line 16, strike, "including" and all that follows down through line 20, and insert in lieu thereof a period.

MR. SEIBERLING. Mr. Chairman, my amendment is intended to save the "Federal preemption" of State law section, which is

Although confusion arose during the enactment of the 1976 Copyright Act, the thrust of the congressional dis-

section 301 of the bill, from being inadvertently nullified because of the inclusion of certain examples in the exemptions from preemption.

This amendment would simply strike the examples listed in section 301(b)(3).

The amendment is strongly supported by the Justice Department, which believes that it would be a serious mistake to cite as an exemption from preemption the doctrine of "misappropriation." The doctrine was created by the Supreme Court in 1922, and it has generally been ignored by the Supreme Court itself and by the lower courts ever since.

Inclusion of a reference to the misappropriation doctrine in this bill, however, could easily be construed by the courts as authorizing the States to pass misappropriation laws. We should not approve such enabling legislation, because a misappropriation law could be so broad as to render the preemption section meaningless.

MR. RAILSBACK. Mr. Chairman, will the gentleman yield?

MR. SEIBERLING. I yield to the gentleman from Illinois.

MR. RAILSBACK. Mr. Chairman, may I ask the gentleman from Ohio, for the purpose of clarifying the amendment that by striking the word "misappropriation," the gentleman in no way is attempting to change the existing state of the law, that is as it may exist in certain States that have recognized the right of recovery relating to "misappropriation"; is that correct?

MR. SEIBERLING. That is correct. All I am trying to do is prevent the citing of them as examples in a statute. We are, in effect, adopting a rather amorphous body of State law and codifying it, in effect. Rather I am trying to have this bill leave the State law alone and make it clear we are merely dealing with copyright laws, laws applicable to copyrights.

MR. RAILSBACK. Mr. Chairman, I personally have no objection to the gentleman's amendment in view of that clarification and I know of no objections from this side.

MR. SEIBERLING. I thank the gentleman.

MR. KASTENMEIER. Mr. Chairman, will the gentleman yield?

MR. SEIBERLING. I will be glad to yield to the gentleman from Wisconsin.

MR. KASTENMEIER. Mr. Chairman, I too have examined the gentleman's amendment and was familiar with the position of

cussion was in the direction of continued state protection. This is further shown by the Report by the Committee on the Judiciary comments on an amendment which clarifies the law of copyright as it applies to computer software. It stated:

> During the course of Committee consideration the question was raised as to whether the bill would restrict remedies for protection of computer software under state law, especially unfair competition and *trade secret laws*. The Committee consulted the Copyright Office for its opinion as to whether section 301 of the 1976 Copyright Act in any way preempted these and other forms of state law protection for computer software. On the basis of this advice and advice of its own counsel the Committee concluded that state remedies for protection of computer software are not limited by this bill. R. Milgrim, 12 Business Organizations, Trade Secrets, § 206A[3] n. 66, app. at B1A–11–12. [Emphasis added.]

The same congressional view can logically be applied to trade secrets other than those embodied in software. We conclude that state trade secret law was not disturbed by the 1976 Copyright Act which specifically contained a preemption section.

3. United States Supreme Court decisions.

In *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964), the question before the United States Supreme Court was "whether a State's unfair competition law can, consistently with the federal patent

---

the Department of Justice. Unfortunately, the Justice Department did not make its position known to the committee until the last day of markup.

MR. SEIBERLING. I understand.

MR. KASTENMEIER. However, Mr. Chairman, I think that the amendment the gentleman is offering is consistent with the position of the Justice Department and accept it on this side as well.

MR. SEIBERLING. I thank the gentleman.

laws, impose liability for or prohibit the copying of an article which is protected by neither a federal patent nor a copyright." *Sears, supra,* 376 U.S. at 225; *see Compco, supra,* 376 U.S. at 234.

In both cases the defendants had copied and marketed plaintiffs' patented light fixtures. The plaintiffs sued on both patent infringement under federal law and unfair competition under state law. The lower courts found the patents invalid in both cases but upheld the unfair competition claims. *Sears, supra,* 376 U.S. at 226–27; *Compco, supra,* 376 U.S. at 235–36.

The Supreme Court reversed both decisions, holding that if the lower court judgments were allowed to stand:

States could allow perpetual protection to articles too lacking in novelty to merit any patent at all under federal constitutional standards. This would be too great an encroachment on the federal patent system to be tolerated.

. . . [B]ecause of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying. *Sears, supra,* 376 U.S. at 232–33. *See Compco, supra,* 376 U.S. at 237–38.

It should be noted that *Sears* and *Compco* did not purport to make any ruling concerning trade secret law. In both cases information—new configuration of plaintiffs' lighting fixtures—had plainly been disclosed to the public by issuance of plaintiffs' patents and by the presence of the lighting fixtures on the open market. The plaintiffs could not have claimed any rights under the law of trade secrets. *See Midland-Ross Corp. v. Sunbeam Equipment Corp.,* 316 F. Supp 171, 177 (W.D. Pa.), *aff'd per curiam,* 435 F.2d 159 (3rd Cir 1970).

Any doubt created by the *Sears/Compco* cases about the continued validity of trade secret law was resolved in favor of state law in *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974).

In *Kewanee,* petitioner Kewanee Oil Co. was the leading manufacturer of synthetic thallium activated scintellation crystals. The process which enabled Kewanee to grow these crystals with a diameter of 17 inches was the trade secret at issue. Respondents were former employees of Kewanee who had left Kewanee to form their own company and produce the same crystals in breach of an employment agreement not to disclose Kewanee's trade secrets. *Id.* at 473.

The precise preemption issue before the Supreme Court was whether Congress, by carefully setting forth the standards of patentability, intended to preclude state protection for secret processes which fall within the patentable subject matter but which were not patented. *Id.* at 472.

*Kewanee* held that misappropriation of trade secrets under state law is not preempted because exclusivity was not vested in Congress for discoveries. The court stated: "The only limitation on the States is that in regulating the area of patents and copyrights they do not conflict with the operation of the laws in this area passed by Congress . . . ." *Id.* at 479. The court then went into a detailed analysis of the objectives and effects of trade secret law to show that the federal policy was "not . . . set at naught, or its benefits denied." *Id.* at 479–80.

The Supreme Court in *Kewanee* has recognized the value of trade secrets. No significant opposition to this aspect of the *Kewanee* decision has been shown by Congress, particularly in view of the statutory evidence that Congress did not intend to preempt trade secret law.

Since no "unmistakable" indication has been given to the contrary by Congress and the weight of the evidence points to the recognition by Congress and other authorities of the value of state protection of trade secrets, we

conclude that state trade secret protection has not been preempted by the federal copyright laws.

## IV. APPROPRIATION FROM TEK-FAX

Young and Harley-Davidson contend that the jury's finding that PRIDE's trade secret was not developed by Tek-Fax and appropriated by MBA was against the great weight and clear preponderance of the relevant evidence. We disagree.

The evidence will be viewed in a light most favorable to the verdict. We will sustain the verdict if there is any credible evidence to support it. *Coryell, supra,* 88 Wis. 2d at 315, 276 N.W.2d at 727. Where, as here, the verdict has the approval of the trial court, the jury's decision is entitled to even greater weight. *Meurer, supra,* 90 Wis. 2d at 450, 280 N.W.2d at 162.

The trial court relied on testimony that the relationship between the two systems was like comparing "kindergarten to college" and that "a great deal of difference existed between them." The trial court also noted that Tom Nies, the principal of Tek-Fax, testified that to his knowledge no materials were taken.

We conclude that the jury's verdict is sustained by credible evidence.

## V. RELEASE OF MAYO and CHAPEL

Young and Harley-Davidson contend that the judgment must be reversed because of the release and dismissal of Mayo and Chapel.

In instructing the jury, the trial court stated that the agreement between counsel and the trial court to release Chapel and Mayo included the assumption of responsibility by Young and Harley-Davidson for Mayo and

Chapel's acts. Young and Harley-Davidson contend that they stipulated only that Mayo and Chapel acted with apparent authority and they never stipulated as to the "assumption of responsibility." As evidence to support their contention, Young and Harley-Davidson refer to the trial court's mischaracterization of the stipulation as supporting their argument. We disagree. The trial court in instructing the jury stated the following:

You will notice that the Court has answered the question concerning whether the Defendants Arthur Young & Company and Harley-Davidson, Incorporated, signed the Non-Disclosure agreement. This is done for your convenience as the parties have agreed to allow the court to find that John Chapel and Harry D. Mayo as employees acted with apparent authority of their employer in their relationship with the Plaintiff. In fact, the action has been dismissed against Mr. Chapel and technically has been dismissed against Mr. Mayo.
Arthur Young & Company and Harley-Davidson, Incorporated, have agreed to assume responsibility for all the acts of Messrs. Mayo and Chapel in this action.

No objection was made at that time by Young or Harley-Davidson to this instruction.

In later correcting itself, the trial court stated:

THE COURT: I should like to correct one thing that I said in my instructions, in reviewing the instruction I said I referred to a technical dismissal. As far as one of the parties was concerned. I don't,—that has something to do with legal function. My function as to what I mean to say was that neither Chapel nor Harry Mayo are a part of your function any longer, that you will not have to answer any questions concerning the relationship to this case. Okay.

It is clear that the only misstatement the trial court is referring to is its reference to the dismissal of Mr. Mayo as a "technical dismissal." The trial court does not confess any misstatement as to the nature of the stipulation.

Furthermore, in closing argument, counsel for Young and Harley-Davidson admitted that Harley-Davidson and Young assumed liability for the acts of Mayo and Chapel.[10] Having assumed responsibility for the acts of

[10] In his closing argument for Harley-Davidson and Young, Mr. Kloehn stated:

Plaintiff's counsel also made the statement, and in fact, made much of the fact that just before the verdict was handed to you, Arthur Young and Harley-Davidson agreed that they would assume responsibility for anything that John Chapel or Harry Mayo may have done in this case, and he tried to make much of the fact that this came at the very end. Well, he omitted a few facts and I think I am entitled to tell you about them.

Neither Harley-Davidson nor Arthur Young ever, in the course of this case, asserted the agency defense. This was a figment of the plaintiff's counsel and on the eve of the trial, just as we were starting on behalf of Arthur Young and Harley-Davidson, I offered to take this question away, to say that Arthur Young and Harley-Davidson assume responsibility for what these men did.

MR. RITERIS: I hate to object, but the argument should be limited to what's in evidence, not what transpired in chambers.

THE COURT: I will allow him, in view of the fact of what was said in your argument, I will allow him to state what your position is.

MR. KLOEHN: But we did so on one condition, and that was that the plaintiff would not use that argument to then try to tell you that 500 partners of Arthur Young participated in any of these activities, conspired to somehow disadvantage Mr. Bryce and they refused to do that.

So, at that point, we said fine, you prove who was involved in this case and if there was anybody from New York, you prove their involvement, before you argue, and sure enough, the minute we conceded that Arthur Young and Harley-Davidson feel that these men are entitled to workmen's compensation for their injury suffered in the course of their work and therefore, assumed liability for them, it was argued before you that all of the partners of Arthur Young did these things and that Arthur Young with full knowledge and their library participated in these things.

It's important to understand the facts of this case, and you heard them all. Who the individuals were and how these decisions were made. This was not a conspiracy in New York.

its employees by stipulation, Young and Harley-Davidson cannot argue here on appeal that the judgment against them should be reversed because of the release and dismissal of Mayo and Chapel.

*By the Court.*——Judgment affirmed.