[No. C000793. Third Dist. Mar. 21, 1990.]

BALBOA INSURANCE COMPANY et al., Plaintiffs and Appellants,
v.

TRANS GLOBAL EQUITIES et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through IV.

1328

**COUNSEL**

Darrell Glahn, Douglas L. Hendricks and Morrison & Foerster for Plaintiffs and Appellants.

Daniel U. Smith, George R. Corey and Corey, Orton, Luzaich & Gemello for Defendants and Appellants.

## OPINION

DAVIS, J.—Defendants Trans Global Equities (Trans Global), Collateral Protection Insurance Services (CPIS), Consolidated Financial Insurance Agency (CFIA), and Consolidated Financial Insurance Agency of Nevada (CFIN), appeal from the judgment for plaintiffs Balboa Insurance Company (Balboa), Newport Insurance Company, Newport Management Corporation (NMC or Newport), and Insurance Automation Corporation.[1] The court awarded Balboa $3,721,000 as profits lost from the defendants' unfair competition with Balboa's insurance businesses. The court also awarded Balboa $75,000 in profits lost when three of the defendants sold Balboa's computer software enhancements.[2] Balboa cross-appeals from the portions of the judgment in favor of Barry Maashoff.[3]

In the published part of the opinion, we address the impact of federal copyright law upon California law regarding unfair competition. To the extent the unfair competition claims rest on trade secret and breach of confidential or fiduciary relationships, they survive a preemption challenge. In the unpublished parts of the opinion we find substantial evidence of breached duties of fidelity and confidentiality, we uphold the trial court's appointment of an expert and calculation of damages, and in considering

---

[1] For convenience, unless otherwise indicated, we refer to the plaintiffs and appellants collectively as "Balboa" and the defendants and appellants simply as "defendants." All of the plaintiffs and appellants appear to be part of a larger whole occasionally identified in the record as "Avco" or "Avco Financial Insurance Group."

In addition to Trans Global, the judgment named as defendants: "Trans Global in whatever form or name it may exist, except Trans Global Equities, Inc." The judgment lists 15 different entities bearing Trans Global's moniker. For convenience, unless otherwise indicated, we refer to the Trans Global entities collectively as "Trans Global."

Since Trans Global Equities, Inc., had filed for bankruptcy, the court severed Balboa's claims against it and reserved jurisdiction. Accordingly, that entity is not before this court.

[2] The court's statement of decision gave Balboa $150,000 for the lost software sale profits. The judgment itself, however, awarded only $75,000. Neither party asks us either to resolve the apparent conflict or interpret that portion of the award.

[3] The court gave judgment to each of the eight individuals Balboa sued. In its notice of cross-appeal, Balboa challenged the judgment as to four of those eight. In its briefs here, however, it only seeks reversal of the judgment in favor of Barry Maashoff. Accordingly, we deem abandoned any challenge to the judgment favoring any of the other individual defendants.

For convenience, unless otherwise indicated or required by context, all references to defendants and appellants as "defendants" also include defendant Barry Maashoff.

Balboa's cross-appeal, we shall reverse the trial court's judgment in favor of defendant Barry Maashoff.

## BACKGROUND

Collateral protection insurance covers a lender's interest in the property that secures a loan. Under typical loan agreements, if the borrower fails to insure the collateral for physical damage, the lender may purchase a policy insuring its security interest and charge the premiums to the borrower.[4]

In 1972, Jack Nelson began a loan collateral tracking service in Stockton. He formed the company eventually known as Collateral Protection Insurance Services (CPIS) to help banks and credit unions keep track of their collateral's insurance status.[5] As insurance agents, Nelson and company could then sell insurance for any uninsured collateral.

The laborious business of tracking thousands of loans on three by five index cards lent itself readily to computerization. By 1979, CPIS had hired programmer Martin Atherton to design software for a Hewlett-Packard computer. That same year, insurance agent Barry Maashoff joined CPIS as its president and manager of the Stockton tracking center. Also that year, to finance the Atherton system, CPIS borrowed $500,000 from Balboa Insurance Company. At the same time, CPIS agreed to sell Balboa's collateral insurance policies to its tracking customers.

By June 1980, CPIS and its agents owed Balboa "several hundred thousand dollars" in premiums for collateral insurance policies placed with Balboa for various lenders. Although CPIS had collected the money from its lenders, it had diverted the funds owed Balboa to "[o]ther purposes and other uses than remitting to Balboa[.]"

To resolve this "out of trust" situation, in June 1980, Balboa required Nelson, Maashoff and other CPIS investors to sign personal guaranties for $1 million. In addition, Balboa required CPIS and its principals to secure the guaranties with the computer tracking system. Finally, Balboa required the new joint venturers of the restructured Stockton service center to write all their business with Balboa.[6]

---

[4] Insurers use two interchangeable terms, "Lender's Single Interest (LSI)" and "Vendor's Single Interest (VSI)," to denominate such policies. Lenders pay the policy premiums and then add the premiums to a loan's balance.

[5] CPIS is synonymous with "Collateral Protection Insurance" (CPI).

[6] In June 1980, CPIS and two other insurance companies formed two new entities as joint ventures: Consolidated Service Bureau (CSB) and Consolidated Financial Insurance Agency

In January 1981, Nelson or Maashoff told Balboa that CPIS and its principals could not make even interest payments on the outstanding debt. As a result, Balboa, CPIS, and the joint venturers negotiated four agreements signed in March 1981. At trial, the parties submitted these agreements as joint exhibits and refer to them here by their exhibit numbers. For convenience, we adopt their nomenclature.

In exhibit 1(a), CPIS gave Balboa's affiliate, Newport Management Company (NMC), a perpetual, nonexclusive license to use the computer tracking software.[7] As part of the license, CPIS authorized NMC to modify the software as NMC saw fit. CPIS agreed that "[a]ny modification made by NMC shall remain the property of NMC."

In exchange for the license, NMC agreed to pay CPIS "special override" commissions. Memorialized in exhibit 1(b), this commission agreement applied to business written on 20 accounts listed on "Exhibit A" attached to the override agreement. NMC agreed to pay CPIS between 1 and 5 percent of net insurance premiums received from Exhibit A policies.[8]

In exhibit 1(c), Balboa released Nelson from his obligations as one of CPIS's guarantors. In exchange, he agreed not to cause any of the 20 accounts listed in Exhibit A or any of an additional 92 accounts listed on an attached Exhibit B to cancel or lapse for 6 months.

Finally, in exhibit 1(d), CPIS agreed to transfer to Balboa its rights to normal commissions from the Exhibit A accounts. CPIS also promised "that it will take no action to cause such policies of insurance to be cancelled, lapse or otherwise terminate." In exchange, Balboa agreed to pay CPIS a 5 percent servicing override commission and to release CPIS from its obligations under the 1980 $1 million note and security agreement.

In exhibit 1(d), Balboa also agreed to pay a similar 5 percent commission for three years on the ninety-two Exhibit B accounts. In March 1984,

---

(CFIA). CSB ran the Stockton tracking center. Maashoff continued to head the center's operations during CSB's tenure. For its part, CFIA contracted to write policies for Balboa. CFIA's joint venturers agreed to transfer all of their collateral protection clients' business to Balboa.

[7] NMC forms part of Balboa's group of companies.

[8] The percentage changed as the "combined annual loss ratio produced by such policies" increased. For loss ratios 50 percent or less, NMC promised to pay a full 5 percent commission. The commission dropped 1 percent for each percent the loss ratio increased until it reached its 1 percent floor for loss ratios of 55 percent or over.

however, the commissions dropped to 1 percent and expired completely five years later. CFIA also signed this agreement.

Shortly after the parties negotiated the four agreements, NMC took over the Stockton loan tracking center's operations. NMC hired Maashoff as its employee to manage the center. Maashoff headed the Stockton service center until September 1981. At that time, he left Balboa's employment to concentrate on selling collateral protection insurance nationwide. In mid-December 1982, Maashoff returned as a "management consultant" to direct the Stockton center's attempts to run more efficiently and smoothly.

After it took over the Stockton center's operations, NMC continued to improve the software licensed from CPIS. It hired the software's original developer, Martin Atherton, to make some of these enhancements. Balboa's employees made others. Maashoff was involved in many of the changes. By 1983, the system's improvements and other changes allowed the Stockton center to become profitable for the first time.

NMC's assumption of management duties at the Stockton center and the transfer of the Exhibit A accounts to Balboa reduced CPIS to collecting its service commissions and marketing its software to other potential loan tracking services. Unfortunately for CPIS, when it licensed its software to NMC in March 1981, both CPIS and Atherton had neglected to keep a copy of the base system.

In 1983, CPIS licensed its software to American Bankers for $150,000. To reconstruct the March 1981 base system, Atherton used a copy of Balboa's system as of September 1981. The September 1981 tape, however, contained extensive changes made by Balboa to the base system. Despite Atherton's efforts to delete these enhancements, the copy of the system delivered in May 1983 to American Bankers contained some. After discussions with Balboa, Atherton attempted again to remove all of Balboa's program material. Even after delivery of the amended tape in late 1983, at least one of Balboa's programs remained in the American Bankers system.

By late 1983, while still the "management consultant" streamlining NMC's Stockton center operations, Maashoff began preparations to form a competing insurance tracking service. He feared that Balboa was going to transfer all of the Stockton center's business to its own system in Irvine. In addition, he feared that Balboa was going to sell insurance directly to the lending institutions. He felt that Balboa would use these actions to reduce

or eliminate commissions that CPIS and CFIA might otherwise earn.[9] Accordingly, in January 1984, CPIS and Trans Global formed a joint venture to establish the Trans Global Financial Service Center in Stockton.

That same month, CPIS licensed its tracking software to Trans Global. On January 30, 1984, Trans Global hired Maashoff to manage the Trans Global center.[10] He began planning for the new center's building and equipment. He also planned the center's personnel requirements. As part of his efforts to staff the new center, Maashoff discussed the strengths and weaknesses of Balboa's employees with Jan Mehlhaff, a department supervisor at Balboa's Stockton service center. Maashoff also began to plan to move accounts from Balboa's tracking service to the new Trans Global center. Fearing that Balboa might find some way to stop it, Maashoff, CPIS, and Trans Global kept their plans secret from Balboa.

During April and May of 1984, events came to a head. In early April, Maashoff met with Balboa's head, Jack Trapp, to propose a deal. Maashoff told Trapp that Balboa could service in its Irvine center any accounts it wanted and that Trans Global would service the rest in its new Stockton center for a commission. A few days later, before he could respond definitively, Trapp resigned as Balboa's president.

Trans Global then moved forward in its plans to compete with Balboa. Trans Global arranged to sell collateral protection insurance from two other carriers. Nelson and Maashoff had a phone line for Trans Global installed in Balboa's Stockton tracking center.

In late April and early May, Nelson solicited for Trans Global and the new carriers some of the Exhibit A accounts that CPIS had assigned to Balboa in 1981. Maashoff felt that they were just taking back these "customers that belonged to [us.]" Many came over. Trans Global promised these customers that the transfer from Balboa to Trans Global meant only a telephone number change; the tracking system, personnel, even the mailbox would remain the same.

---

[9] As noted above, however, under exhibit 1(d), many of the commissions were scheduled for reduction from 5 to 1 percent on March 1, 1984. Moreover, in an amendment to exhibit 1(d), Balboa had agreed to pay CPI for three years a 5 percent override commission on all accounts "produced directly by the influence of CPI or CFIA" that Balboa transferred from Stockton to Irvine. After March 31, 1984, Balboa agreed to pay a 1 percent commission on such accounts for an additional five years.

[10] Trans Global contracted with CPIS to have CPIS's "agent and employee," Maashoff, run the new center. The agreement specifically gave Maashoff the right to continue "supervising the operation of the [NMC] servicing center . . . and making required changes to programs licensed to [NMC]."

In April, Maashoff announced the Trans Global center's opening to Balboa's employees. He hoped "to solidify a loyal base of employees for Trans Global in the event that [Balboa] refused to follow [Maashoff's] proposal [to take over Balboa's accounts] . . . ." He directly approached department supervisors Mehlhaff and Fenley as well as employee Jodie Thomas. He successfully lured Mehlhaff. He told other key Balboa employees of the availability of jobs with Trans Global.

In early May, Maashoff had one of Balboa's programmers, Susan McCrory, spend two weeks of her vacation working at Trans Global's new center. Maashoff had her complete programs she had been writing for Balboa so that both Trans Global and Balboa could use them.[11]

The developments' pace continued to accelerate in early May. At that time, Maashoff learned that Balboa was going to close the Stockton center and transfer the business to its Irvine system. Maashoff encouraged Balboa supervisor Darryl Fenley to organize a walkout of Balboa's remaining employees.[12] Maashoff also urged Balboa's employees to forward tapes containing certain client information from Balboa to Trans Global without notifying Balboa immediately that the clients were leaving.

On May 10, 1984, Balboa sued for an injunction and damages against Trans Global. Among other things, its complaint asked the court to enjoin Trans Global from: 1) using or transferring Balboa's enhancements to the "support system and software"; 2) "using . . . any confidential information obtained from [Balboa]"; and 3) soliciting Balboa's customers, agents, or employees. In late May and early June, the court granted preliminary relief against Trans Global's use of Balboa's software and confidential information.

Trans Global then answered and cross-complained for breach of contract, breach of the covenant of good faith and fair dealing, and abuse of process. The court sustained with leave to amend Balboa's demurrer to the abuse of process and breach of contract claims. Upon Trans Global's failure to amend timely, the court dismissed these two causes of action. Balboa eventually dismissed its "breached good faith covenant" claim, raising the argument solely as an affirmative defense.

---

[11] At her deposition, McCrory testified that these programs were as much as 95 percent complete at the time she brought them down to Trans Global to finish. Maashoff disputed her estimate.

[12] Balboa announced the closure, effective May 18, on May 4. Fenley did not organize a walkout.

On July 31, 1984, each side deposited in court a copy of their computer software source codes. They stipulated that such software was "valuable and confidential trade secrets which are the essence of the competitive advantage of their respective businesses" and agreed to limit disclosure only to litigation needs.

Trial eventually began April 16, 1985. The court trial extended over 23 days. The evidence conflicted substantially.

Following trial, on July 5, 1985, the court appointed Larry Dold to analyze the testimony and exhibits regarding the software copying. Dold outlined his conclusions in a letter to the court. The parties later examined him at a hearing on the report.

In his letter, Dold concluded that: "1. Many of the fixes, or corrections of errors, implemented by Balboa after March 1981 remain in the Trans Global program. 2. Some of the enhancements and changes made by Balboa after March 1981 are still in the Trans Global programs. 3. Trans Global requested Susan McCrory to not only come to work for them during 1984, but to also bring with her copies of programs that she was currently working on at Balboa.

At the hearing, he amplified his conclusions. He noted that the bare number of program lines did not necessarily reveal a given modification's importance. He also doubted strongly that Atherton's memory could account for the extent of duplication between the systems. He also testified that Atherton could only have independently recreated the extensive modifications with great difficulty.

The court issued its intended decision on December 11, 1985. The court announced its intent to find that the complaint stated one cause of action, for unfair competition.[13] The court tentatively found that Trans Global and the other defendants competed unfairly in three ways: 1) by soliciting the Exhibit A accounts; 2) by hiring away Balboa's key employees; and 3) by selling and using Balboa's software modifications without authorization. The court rejected the defendants' affirmative defenses.[14] It tentatively

---

[13] The court rejected Balboa's claim that the complaint stated four separate causes of action. In addition to the unfair competition claim, Balboa had argued that its complaint stated claims for breach of contract, conversion and breach of the covenant of good faith and fair dealing.

[14] Neither the tentative decision nor the statement of decision mention the "breach of the covenant of good faith and fair dealing" defense.

awarded Balboa $3,721,000 as lost profits and $150,000 for the unauthorized sale of the Balboa software modifications.

The court issued its statement of decision on July 18, 1986. In addition to the three unfair competition grounds tentatively found, the court also concluded that the defendants competed unfairly when they "utilized the managerial efforts of Barry Maashoff to create a competing loan tracking service for Trans Global." The court left intact its damages calculation. The court refused to find either Maashoff or Nelson liable individually. On July 22, 1986, the court entered judgment and these timely appeals followed.

## DISCUSSION

### I. COPYRIGHT LAW DOES NOT PREEMPT UNFAIR COMPETITION CLAIMS BASED ON TRADE SECRET AND BREACHES OF CONFIDENCE OR FIDUCIARY DUTY

#### A. *Defendants May Raise Their Preemption Argument*

■ Defendants contend that federal copyright law preempts Balboa's unfair competition claim. They admit they did not raise this defense below. Nevertheless, they claim that the copyright preemption defense goes to the trial court's jurisdiction. We agree.

As Balboa notes, normally we do not consider affirmative defenses not tendered below. (See, e.g., *Roystar* v. *Montanez* (1982) 134 Cal.App.3d 362, 366 [184 Cal.Rptr. 560].) Nevertheless, as Witkin notes, exceptions exist. "The rule that the appellate court will not consider points not raised below . . . is limited to matters involving only the rights and interests of the litigant which could have been cured in the trial court. It does not apply to the following: (1) A noncurable defect of substance where the question is one of law, *such as lack of jurisdiction . . . or complete failure to state a cause of action. . . .*" (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 315, p. 326, italics added.)

Here, both of the above mentioned exceptions apply. First, to the extent defendants establish preemption, by definition no state cause of action exists. Second, federal law gives exclusive jurisdiction over copyright disputes to the federal courts. (28 U.S.C.S. § 1338(a).) A successful copyright preemption argument would eliminate the trial court's very power to enter

judgment over the defendants here. Accordingly, we shall consider the preemption argument.[15]

B. *Copyright Law Does Not Preempt Unfair Competition Claims Based on Trade Secret and Breaches of Confidence or Fiduciary Duty.*

Federal law expressly preempts state laws that aim to protect "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by [17 U.S.C.S. § 106]. . . . [After January 1, 1978] no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." (17 U.S.C.S. § 301(a).) (Further citations to undesignated code sections refer to this title.) At the same time, federal law allows states to regulate "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by [17 U.S.C.S. § 106]." (17 U.S.C.S. § 301(b)(3).) Moreover, the statute that gives the federal courts exclusive jurisdiction over copyright claims allows jurisdiction over state law "unfair competition" claims when joined with a substantial and related claim under copyright laws. (28 U.S.C.S. § 1338(b).) Thus, copyright's preemptive effect on a state unfair competition claim depends upon whether the state law protects "legal or equitable rights that are equivalent" to the exclusive rights specified in section 106.

Section 106 generally gives a copyright owner exclusive right: "(1) to reproduce the copyrighted work . . . ; [¶] (2) to prepare derivative works based upon the copyrighted work; [¶] (3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; [¶] (4) [if applicable] to perform the copyrighted works publicly; and [¶] (5) [if applicable] to display the copyrighted work publicly." (17 U.S.C.S. § 106.) ■ Borrowing section 106's language, Professor Nimmer summarizes: "a right which is 'equivalent to copyright' is one which is infringed by the mere act of reproduction, performance, distribution or display." (1 Nimmer on Copyright (Rel. 23) § 1.01[B], at p. 1-12 [fns. deleted; hereinafter, Nimmer].)

Nimmer elaborates: "If under state law the act of reproduction, performance, distribution or display, no matter whether the law includes all such acts or only some, will *in itself* infringe the state created right, then such

---

[15] (Accord *Boeing* v. *Sierracin* (1987) 108 Wn.2d 38 [738 P.2d 665, 674] [since preemption goes to court's jurisdiction, appellate court will consider it]; see contra *J & K Computer Systems, Inc.* v. *Parrish* (Utah 1982) 642 P.2d 732, 736 [failure to raise preemption as affirmative defense in trial court bars consideration on appeal].)

right is preempted. But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption." (*Id.* at p. 1-13 [italics in original, fns. deleted].)

Courts have denominated Nimmer's analysis the " 'extra element' test." (See, e.g., *Gladstone* v. *Hillel* (1988) 203 Cal.App.3d 977, 987 [250 Cal.Rptr. 372].) "While generally accepting this test, the courts have demanded that the extra element 'must be one that changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim.' [Citations, italics in source of quotation.]" (*Ibid.*)

██ ██ ██ ██ We assume strictly arguendo that Balboa could have received copyright protection for its software modifications. (See, e.g., *Whelan Associates, Inc.* v. *Jaslow Dental Laboratory* (3d Cir. 1986) 797 F.2d 1222, 1229-1242; *Apple Computer, Inc.* v. *Franklin Computer Corp.* (3d Cir. 1983) 714 F.2d 1240, 1248 [70 A.L.R.Fed. 153].)[16] Copyright law would thus have protected Balboa from unauthorized duplication or transfer of its programs by Maashoff, Atherton or CPIS. ██ To survive preemption, Balboa's complaint must allege an element beyond "unauthorized duplication or transfer." Moreover, that element must make the state claim "qualitatively different from a copyright infringement claim."

We turn first to the complaint itself. After a 23-day trial, the court below concluded that the complaint stated only a cause of action for "unfair competition."[17] Admittedly, the defendants' failure to raise its defense below prevented the trial court from analyzing the complaint under copyright preemption law. Nevertheless, two reasons make the court's use of the unfair competition label unfortunate.

---

[16] The record does not allow us to determine the scope, if any, of such copyright protection. In general, a copyright applicant must demonstrate authorship, originality and fixation in a proper form. (See generally Scott, Computer Law (1984) §§ 3.17 to 3.37.)

Plaintiffs' failure to comply with such statutory prerequisites to copyright protection as notice or deposit does not allow them to evade any of copyright's preemptive sweep. (See 1 Nimmer, *supra*, § 1.01[B]; *Maheu* v. *CBS, Inc.* (1988) 201 Cal.App.3d 662, 672 [247 Cal.Rptr. 304].)

[17] Balboa's complaint makes no attempt to identify its theories of relief. Defendants did not demur or otherwise attempt to get Balboa to state its theories of relief specifically. The parties appear to have framed the case below simply by reference to general equitable principles.

As such, the parties virtually ignored the specific elements of unfair competition claims for breach of confidence, breach of fiduciary duty and trade secret misappropriation. This failure to frame the pleadings and trial in conventional legal terms has greatly and unnecessarily complicated our review of this 3,000-page record.

First, it merely begs the preemption question: does copyright preempt *these kinds* of unfairly competitive acts merely because they involve computer software? ■ "Unfair competition" includes a broad range of claims. At best, copyright preempts only some of the claims included in the term "unfair competition." (See, e.g., *Smith* v. *Weinstein* (S.D.N.Y. 1984) 578 F.Supp. 1297, 1306-1308 [unfair competition preempted only to extent that plaintiffs seek to recover profits defendant derived from unauthorized use of ideas; "palming off" branch of unfair competition law not preempted; breach of confidence not preempted]; see also *Walker* v. *Time Life Films* (2d Cir. 1986) 784 F.2d 44, 53 [unfair competition preempted to extent plaintiff seeks protection against copying; breach of confidence not preempted].)

The breadth and analytical vagueness of unfair competition law complicates the preemption analysis greatly. One branch of unfair competition law involves contractual provisions by one party, usually an employee or partner, not to compete against its former employer or partner. (See, e.g., Bus. & Prof. Code, §§ 16600-16602; The Law of Competitive Business Practices (Cont.Ed.Bar. 1981) pp. 60-64.) Courts usually construe these covenants narrowly against the former employer or partner. (See, e.g., *KGB, Inc.* v. *Giannoulas* (1980) 104 Cal.App.3d 844, 847-855 [164 Cal.Rptr. 571].) Although defendants here cite many of these competitive restraint cases, no such express covenants apply to this case's resolution.

Beyond the contractual branch lies a host of often overlapping theories in the tort branch. "[I]n addition to valid contractual provisions [not to compete unfairly], an employer may use one or more tort theories to support an injunction against unfair competitive activities by a former employee: breach of confidential relationship, breach of fiduciary duty, interference with prospective economic advantage, advantageous business relationships [*sic*], and interference with contractual relations." (The Law of Competitive Business Practices, *supra*, at p. 63.) Each of these tort theories raises its own issues. As demonstrated more fully below, the complaint arguably implicates at least two of these tort theories.

Two other branches of unfair competition also arguably apply. Courts and commentators frequently analyze separately unfair competition and trade secrets protection. (See The Law of Competitive Business Practices at p. 109 [law of trade secrets "can augment the traditional business torts of unfair competition . . . and breach of fiduciary duty. . . ."]; see also *post*, fns. 19-22 and accompanying text.) Nevertheless, at bottom, trade secret protection is itself but a branch of unfair competition law. (See, e.g., *KGB,*

*Inc., supra,* 104 Cal.App.3d at p. 850; Comment, *Simultaneous Copyright and Trade Secret Protection for Computer Programs* (1983) 23 Santa Clara L.Rev. 1037, 1039 ["Trade secrecy is a branch of unfair competition . . . ."]; Scott, Computer Law, *supra,* § 5.30, pp. 5-27, 5-28 [hereinafter, Scott].)

Common law misappropriation presents a final legal theory under the broad unfair competition umbrella. The doctrine originated in the United States Supreme Court's decision of *International News Service* v. *Associated Press* (1918) 248 U.S. 215 [63 L.Ed. 211, 39 S.Ct. 68, 2 A.L.R. 293]. (See Scott, *supra,* at p. 5-28.) ▮ "It is normally invoked in an effort to protect something of value that is not covered either by patent or copyright law on the one hand, or by traditional doctrines of unfair competition, such as trade secret theft or breach of confidential relationship, on the other." (*Id.* at pp. 5-27 to 5-28 [fns. deleted].) The cause of action has three elements: "(1) the plaintiff has invested substantial time and money in development of its . . . 'property'; (2) the defendant has appropriated the [property] at little or no cost; and (3) the plaintiff has been injured by the defendant's conduct." (*Id.* at p. 5-28.)

In addition to common law unfair competition, California has a statute allowing a court to enjoin unfairly competitive acts. (See Bus. & Prof. Code, §§ 17200 & 17203.) The remedies available under the statute are "cumulative to each other and to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, § 17205.) Plaintiffs have not argued here or below that they seek relief under this statute. Accordingly, it appears they have confined their claim to common law unfair competition.

For a second reason the trial court's use of the unfair competition label is unfortunate. ▮ In a proper case, the same conduct may support relief under multiple theories.[18] Preemption law, however, requires analysis of each theory to determine whether it contains the necessary qualitatively different extra element distinguishing it from copyright protection. Indeed, courts and commentators have devoted considerable attention to the preemptive effect of copyright on trade secret alone.[19] Accordingly, in

---

[18] For example, a trade secrets claim often requires proof of a confidential relationship. (See, e.g., Rest.1st Torts, § 757(b) & com. (j).) The relationship of principal and agent exemplifies such confidential relationships. (*Id.* at com. (j), p. 13.) An agent, however, owes duties of loyalty and confidence independent of information's "trade secret" status. (See, e.g., Rest.2d Agency, §§ 387 & 396.) Thus, the same conduct conceivably could give rise to three claims: 1) improper use or disclosure of trade secrets; 2) breach of the duty of confidence; and 3) breach of fiduciary duty.

[19] (See, e.g., Bender, *Protection of Computer Programs: The Copyright/Trade Secret Interface* (1986) 47 U.Pitt.L.Rev. 907 [hereinafter, Bender]; Hazen, *Contract Principles as a Guide*

reviewing plaintiffs' complaint, we must consider the range of potential theories of unfair competition. Similarly, in reviewing the case law covering the range of unfair competition claims, we must separate the particular theories confronting each court.

■ Construction of a complaint presents a legal question for our independent review. "As a reviewing court we are not bound by the construction placed by the trial court on the pleadings but must make our own independent judgment thereon, even as to matters not expressly ruled upon by the trial court." (*Miller* v. *Bakersfield News-Bulletin* (1975) 44 Cal.App.3d 899, 901 [119 Cal.Rptr. 92].)

The critical portions of the complaint come in paragraphs 7 through 13. In those paragraphs, Balboa outlines its claims involving its alleged confidential relationship with Maashoff. The allegations first focus on Maashoff's "access to confidential information regarding *all* aspects of the business of [Balboa]. . . ." Balboa then gave four examples of Maashoff's knowledge of confidential information: 1) "the content, capabilities, and operation of the updated support system and computer software developed by plaintiffs since acquisition of the system March 4, 1981"; 2) "the commission structure for the agents writing insurance with Balboa . . ."; 3) "the terms and conditions of employment of Newport's Stockton employees"; and 4) "the identity and other information concerning clients and accounts . . . ."

The complaint then alleges that Maashoff and the other defendants used the confidential information and "have induced agents and lending institution accounts writing insurance with Balboa through Newport as a general agent to transfer business to Trans Global and are attempting to prevail upon other agents to do the same; defendants induced employees of Newport to terminate employment with Newport and to undertake employment with Trans Global and have threatened to induce all of Newport's employees to leave Newport for Trans Global."

These portions of the complaint reveal Balboa's principal claimed right and the effect of the defendants' alleged wrong. First, Balboa claims a right

*for Protecting Intellectual Property Rights in Computer Software: The Limits of Copyright Protection, the Evolving Concept of Derivative Works, and the Proper Limits of Licensing Arrangements* (1986) 20 U.C. Davis L.Rev. 105; Comment, *Federal Copyright Protection and State Trade Secret Protection: The Case for Partial Preemption* (1984) 33 Am.U.L.Rev. 667; Rosen, *A Common Law for the Ages of Intellectual Property* (1984) 38 U. Miami L.Rev. 769; Kelso & Rebay, *Problems of Interpretation Under the 1980 Computer Amendment* (1983) 23 Santa Clara L.Rev. 1001; Comment, *Simultaneous Copyright and Trade Secret Protection for Computer Programs* (1983) 23 Santa Clara L.Rev. 1037.)

in certain confidential information essential to its business. The computer software plays only one of four specified parts of the overall essential information. Indeed, the software itself is identified in tandem with "the updated support system." The complaint's face thus further narrows the software's importance by distinguishing the support system in general and the software in particular.

Second, the harm allegedly done to Balboa comes from the *use* of this confidential information to lure Balboa's clients and employees and render valueless the consideration CPIS paid to Balboa in 1981. In these portions of the complaint, Balboa does not allege an improper "reproduction, performance, distribution or display." Rather, in effect, Balboa alleges that the knowledge gained from the confidential information allowed defendants an improper head start in its competition with Balboa.

We construe the complaint liberally. In such light, the above portions of the complaint outline claims arguably arising under four unfair competition theories: breach of confidential relationship,[20] breach of fiduciary duty,[21]

---

[20] The Restatement Second of Agency generally describes an agent's duties to maintain a principal's confidences. (Rest.2d Agency, §§ 395 & 396.) Section 395 states: "Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge." Section 396 then extends the duty even after the agency's termination "unless otherwise agreed."

The defendants argue that Maashoff owed no such duties since the complaint describes him as a "consultant." We consider below the evidence critical to this question's determination. Here, however, we focus solely on the pleadings. The complaint adequately alleges that Newport "employed" Maashoff. Normally, an "employee" owes a duty to preserve the employer's confidences. (See, e.g., *id.* at § 2(2) & coms. a-d, § 396(b) & com. b.)

In addition to the specific duties of confidence owed by an agent, several California courts have recognized an independent tort of "breach of confidence." (See, e. g., *Tele-Count Engineers, Inc.* v. *Pacific Tel. & Tel. Co.* (1985) 168 Cal.App.3d 455, 462 [214 Cal.Rptr. 276]; *Faris* v. *Enberg* (1979) 97 Cal.App.3d 309, 321 [158 Cal.Rptr. 704].) Under *Faris*, "[a]n actionable breach of confidence will arise when an idea, whether or not protectable [under copyright] is offered to another in confidence, and is voluntarily received by the offeree in confidence with the understanding that it is not to be disclosed to others, and is not to be used by the offeree for purposes beyond the limits of the confidence without the offeror's permission. . . . There must exist evidence of the communication of the confidentiality of the submission or evidence from which a confidential relationship can be inferred. Among the factors from which such an inference can be drawn are: proof of the existence of an implied-in-fact contract [citation]; proof that the material submitted was protected by reason of sufficient novelty and elaboration [citation]; or proof of a particular relationship such as partners, joint adventurers, principal and agent or buyer and seller under the circumstances. [Citations.]" (97 Cal.App.3d at p. 323.)

[21] The Restatement Second of Agency generally outlines an agent's duty of loyalty. (Rest.2d Agency, §§ 387-394.) Five sections of that Restatement discuss the duty of loyalty

trade secrets[22] and misappropriation.[23] Paragraphs 7 through 13 of the complaint focus on the use of a wide range of confidential information that generally has nothing to do with the subject of copyright. Moreover, the claimed damages come from loss of key employees and clients.

Two other portions of the complaint, however, complicate the analysis. First, in between two of the paragraphs quoted above, Balboa pleaded: "Defendants have sold said support system and software made and owned by plaintiffs to a competitor, American Bankers Life Insurance Company

---

arguably applicable here. Section 387 states: "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Section 391 states: "Unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge." Section 393 states: "Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Section 394 states: "Unless otherwise agreed, an agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters which the agent is employed." Finally, section 396 extends the duty even after the agency's termination "unless otherwise agreed."

[22] Section 757 of the First Restatement of Torts outlines a cause of action for unauthorized use or disclosure of another's trade secrets. That section states: "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or (c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or (d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."

California has adopted the First Restatement of Torts' trade secret synopsis. (*Uribe* v. *Howie* (1971) 19 Cal.App.3d 194, 207-208 [96 Cal.Rptr. 493]; see generally Note, *A Balanced Approach to Employer-Employee Trade Secrets Disputes in California* (1980) 31 Hastings L.J. 671; Rest.2d Torts, Introd. note to div. 9, pp. 1-2.) Section 757, comment b, defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [one] an opportunity to obtain an advantage over competitors who do not know or use it." The comment then describes the necessity of keeping the information secret: "a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. . . . Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of [one's] business; (2) the extent to which it is known by employees and others involved in [one's] business; (3) the extent of the measures taken by [the proprietor] to guard the secrecy of the information; (4) the value of the information to [the proprietor] and to [the proprietor's] competitors; (5) the amount of effort or money expended by [the proprietor] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." (Rest.1st of Torts, § 757, com. b: see *Uribe* v. *Howie, supra,* 19 Cal.App.3d at p. 208.)

In 1984, California adopted its version of the Uniform Trade Secrets Act. (Stats. 1984, ch. 1724, § 1, codified at Civ. Code, §§ 3426-3426.10; see *American Paper & Packaging Products, Inc.* v. *Kirgan* (1986) 183 Cal.App.3d 1318, 1322-1324 [228 Cal.Rptr. 713].) The act, however, does not apply to misappropriations that occurred before January 1, 1985. (Civ. Code, § 3426.10.) Since plaintiffs filed their complaint in 1984, trade secret common law applies here.

[23] We have outlined the elements of misappropriation, *ante*, page 1342.

and, unless restrained, will sell said support system and software, including the changes made by plaintiffs since March 4, 1981, to other competitors of plaintiffs."

Second, the complaint highlights the twin roles played in defendants' success by Maashoff's confidential information and the access to the Balboa tracking system modifications: "Even with months of advance preparation, defendants' ability to induce the transfer of business from plaintiffs to Trans Global depends upon the ability of defendants to provide support service by use of the modified support system and software developed and owned by plaintiffs since March 4, 1981, and the utilization of confidential information obtained from plaintiffs by Barry Maashoff while employed as a consultant by Newport."

Unlike the broader confidential information allegations, these two paragraphs focus directly on two unauthorized uses of Balboa's software improvements. First, the complaint focuses on the sale to American Bankers. In the prayer for relief, Balboa expressly requests damages for the "profits derived by defendants from sale of all or any part of plaintiffs' support system and software." Second, it emphasizes the importance of Trans Global's own use of Balboa's software. By these allegations of unauthorized sale and use of software, Balboa has shifted the complaint towards areas within copyright's traditional domain.

 The parties' preemption dispute thus boils down to whether the "confidential and fiduciary relationship" allegations, including trade secret, properly subsume the "unauthorized use" allegations and add the necessary "qualitatively different element" to escape preemption. For help, we turn to the copyright preemption cases involving state unfair competition claims based upon breached confidential relationships, breached fiduciary duty, trade secrets and misappropriation

We consider first the cases reviewing copyright preemption of trade secret law. Of the four principal cases, only one has found preemption.[24] In *Videotronics, Inc.* v. *Bend Electronics* (D.Nev. 1983) 564 F.Supp. 1471, 1476-1477, the court expressly held that copyright law preempted state law claims for misappropriation, trade secrets and unfair competition. Plaintiffs developed a computer video program called "Challenger Wild Poker." The

---

[24] In *Avco Corp.* v. *Precision Air Parts, Inc.* (M.D.Ala. 1980) 210 U.S.P.Q. (BNA) 894, the district court also found preemption of a purported trade secret. The court noted, however, that the complaint failed to allege invasion of privacy, trespass, breach of trust or breach of confidentiality. (*Id.* at pp. 897-898.)

Arguably, *Avco* merely held "that no trade secret claim was properly pleaded (rather than it was preempted). The court of appeals affirmed dismissal on a statute of limitation theory, and found it unnecessary to reach this issue." (Bender, *supra*, 47 U.Pitt.L.Rev. at pp. 925-926, fn. 57; see *Avco* v. *Precision Air Part, Inc.* (11th Cir. 1982) 676 F.2d 494.)

defendants originally contracted with plaintiffs to distribute the product. Later, however, they began to manufacture and sell copies of plaintiffs' product without permission. Plaintiffs sued for violations of trade secret under Nevada law. (*Id.* at p. 1475.)

After reciting the Restatement's outline of trade secrets law, the court found that the defendants had *not* gotten the information necessary to copy the program by breaching a confidential relationship. (564 F.Supp. at pp. 1475-1476.) The court found that any owner of plaintiff's game could have decoded the game's workings. Accordingly, the court found that trade secrets law itself did not protect plaintiffs. (564 F.Supp. at p. 1476.)

The court then looked to the law of misappropriation. It concluded that the copyright protection afforded plaintiffs' computer program preempted "relief under the state common law doctrines of misappropriation and trade secret . . . ." (564 F.Supp. at p. 1477.)[25]

*Videotronics*'s statement about trade secret preemption is pure dicta. The court had earlier found no breach of confidential relationship under state trade secret law. Since no state trade secrets claim existed, the court should have confined itself to its misappropriation holding. Moreover, the analysis leading up to that holding lacks any discussion of how misappropriation law is equivalent to copyright. (See Bender, *supra*, 47 U.Pitt.L.Rev. at p. 927.)

Three courts have rejected claims that copyright preempts state actions based on trade secrets.[26] In *Warrington Assoc., Inc.* v. *Real-Time Eng. Systems, Inc.* (N.D.Ill. 1981) 522 F.Supp. 367, the plaintiff sued for wrongful appropriation and use of trade secrets from its computer programs. The court rejected the defendants' copyright preemption argument. It based its decision on a perceived lack of equivalence between copyright and trade

---

[25] In an earlier passage, the court stated: "A property which is subject to protection under federal patent or copyright law cannot also obtain the benefit of protection under either state *unfair competition* or misappropriation law . . . ." (*Id.* at p. 1476, italics added.) The uncritical substitution of "trade secrets" for the earlier reference to "unfair competition" exemplifies the failure of many courts to distinguish crisply the various unfair competition theories.

[26] These cases represent the only extensive discussions. In several other cases, courts have concluded briefly or in dicta that copyright does not preempt state actions based on breached confidential relationships. (See, e. g., *Foresight Resources Corp.* v. *Pfortmilles* (D.Kan. 1989) 719 F.Supp. 1006, 1011 [Kansas Uniform Trade Secrets Act not necessarily preempted]; *Vault Corporation* v. *Quaid Software, Ltd.* (E.D.La. 1987) 655 F.Supp. 750, 763 [Louisiana Uniform Trade Secrets Act not preempted]; *Boeing* v. *Sierracin Corp., supra*, 738 P.2d 665, 674 [following *Real-Time*]; *Freedman* v. *Select Information Systems, Inc.* (N.D.Cal. 1983) 221 U.S.P.Q. 848, 850, 851, fn. 2 [preemption and trade secrets mentioned in passing]; *BPI Systems, Inc*, v. *Leith* (W.D.Tx. 1981) 532 F.Supp. 208, 211 [no preemption of trade secret allegation]; see generally Bender, *supra*, 47 U.Pitt.L.Rev. at pp. 929-931.)

secret.[27] The court also found passages in the legislative history of the 1976 revision to the Copyright Act that supported its view.[28] Finally, the court found that the courts of the states that provided the relevant trade secrets law "have continued to recognize causes of action for trade secret misappropriation subsequent to the amendment of the federal Copyright Act of 1976. The common law of each of these forums stresses that the trade secrets tort is premised on concepts of breach of trust and confidentiality, and not copying. [Citations.]." (*Id.* at p. 369.)[29]

In *Brignoli* v. *Balch Hardy and Scheinman, Inc.* (S.D.N.Y. 1986) 645 F.Supp. 1201, the court considered a series of state law claims arising out of a computer program's unauthorized use. Citing the "qualitatively different extra element" test, the court noted that a mere "claim that a defendant made unauthorized use of copyrightable material falls squarely within § 301 and is thus preempted. [Citation.]" (*Id.* at p. 1205.) Nevertheless, the court found sufficiently different "extra elements" to avoid preemption.

The court's discussion of the second and sixth causes of action is most relevant to the case before us. Concerning the second cause of action, the court stated: "Although that part of Brignoli's second claim which alleges 'willful unauthorized use of plaintiff's property' might seem to come within § 301, Brignoli's allegations that the programs are trade secrets make this claim 'qualitatively different' from a copyright claim." (645 F.Supp. at p. 1205.) The court then found that the sixth claim "alleges a breach of an agreement of confidentiality or duty of confidentiality. Such a claim is not equivalent to a copyright claim. [Citation.]" (*Ibid.*) Accordingly, without more analysis, the court found that copyright preempted none of plaintiff's claims. (*Id.* at p. 1206.)

---

[27] The court stated: "It is well-settled that copyright protection extends not to an idea itself, but rather to the particular expression used by its author. [Citations.] In contrast, the protection provided by the common law of trade secret misappropriation extends to the very ideas of the author, subject, of course, to the requirement that the idea has some originality and is as yet undisclosed or disclosed only on the basis of confidentiality. [Citations.] The practical distinction between the two interests is manifest. While disclosure of the expression does not vitiate rights secured by copyright law, that same disclosure may well strip the underlying idea of its confidentiality, and thus its status as a trade secret." (522 F.Supp. at p. 368.)

[28] The court cited a portion of the House Committee Report: "The evolving common law rights of 'privacy,' 'publicity' and trade secrets, . . . would remain unaffected so long as the causes of action contain elements such as an invasion of personal rights or a breach of trust or confidentiality . . ." (522 F.Supp. at p. 369, quoting H.Rep.No. 94-1476, 94th Cong., 2d Sess. 132 (1976) reprinted in 5 U.S. Code Cong. & Admin. News at pp. 5746-5747 (1976).)

[29] The court also compared preemption analysis in patent law. It noted that the Supreme Court had found no patent law preemption of state trade secrets law. (*Id.* at p. 369, citing *Kewanee Oil Co.* v. *Bicron Corp.* (1974) 416 U.S. 470 [40 L.Ed.2d 315, 94 S.Ct. 1879].) The court concluded: "If anything the congruence and, concomitantly, the likelihood of preemption, between patent and trade secret law is stronger than between trade secret and copyright law." (522 F.Supp. at p. 369.) Thus, the court implied that if patent law did not preempt trade secret law, then copyright did not either.

In *M. Bryce & Associates* v. *Gladstone* (1982) 107 Wis.2d 241 [319 N.W.2d 907], the Wisconsin Court of Appeals gave the most extensive discussion of preemption matters. For three reasons, it concluded that copyright did not preempt trade secrets law.

First, it focused on the differences between copyright and trade secret law. Like the *Real-Time* court, it found that "[t]he line of demarcation between trade secret and copyright protection is clear. Trade secret law protects content irrespective of form of expression; copyright law protects form of expression but not the underlying ideas." (319 N.W.2d at p. 915.) It noted that trade secret law bars unauthorized disclosure or use of these ideas "only by persons who are privy to the trade secret by reason of some relationship to the owner which legally limits use or disclosure by them. ▮▮▮▮ Copyright law prohibits unauthorized copying by anyone of the form of expression in which the ideas are fixed by the author. [Citations.]" (*Id.* at pp. 915-916.)[30]

Second, the court also reviewed the legislative history of the 1976 and 1980 Copyright Act amendments. Although it found some confusion in the legislative history of the 1976 amendments, it concluded that "the thrust of the congressional discussion was in the direction of continued state protection." (319 N.W.2d at p. 918.)[31] It found particular solace in a portion of the House Judiciary Committee's report on the 1980 amendments. (*Ibid.*) Those amendments addressed some applications of copyright law to computer software. (*Ibid.*) The House report stated: "The Committee consulted the Copyright Office for its opinion as to whether section 301 of the 1976 Copyright Act in any way preempted [unfair competition and trade secret] and other forms of state law protection for computer software. On the basis

[30] The court may have overstated the requirement of a confidential relationship for trade secret law. (Bender, *supra*, 47 U.Pitt.L.Rev. at p. 929, fn. 76.) While such a confidential relationship usually exists, trade secret law may bar unauthorized disclosure by strangers to the secret who stumble upon it improperly or with notice of mistake. (*Ibid.;* see also Rest.1st Torts, § 757.)

[31] One commentator has implicitly agreed with *Real-Time* and found that the 1976 amendments' legislative history weighs strongly against preemption. (See Hazen, *supra*, 20 U.C. Davis L.Rev. at p. 133 [citing *Real-Time and Bryce*].) The more exhaustive studies, however, agree with*Bryce*and find a confusing, even ambiguous, legislative history. (See 1 Nimmer, *supra*, § 1.01[B] at pp. 1-14 to 1-20.3; Scott, *supra*, § 3.77 at pp. 3-74 to 3-76; Bender, *supra*, 47 U.Pitt.L.Rev. at pp. 931-934.)

The confusion results from the deletion of an early draft bill that would have expressly *not* preempted state law "rights against misappropriation not equivalent to any of [the exclusive copyright] rights, breaches of contract, breaches of trust, trespass, conversion, invasion of privacy, defamation, and deception [*sic*] trade practices such as passing off and false representation . . . ." (See *Bryce, supra*, 319 N.W.2d at p. 917.) The floor debate between three representatives who discussed deletion of the above text further complicates the analysis. (See *Bryce, supra*, 319 N.W.2d at p. 917.) As summarized in *Bryce*, the three representatives "agreed that the examples should be deleted but seemed to differ on whether this action was to limit or expand preemption." (*Bryce, supra*, 319 N.W.2d at p. 917.)

of this advice and advice of its own counsel the Committee concluded that state remedies for protection of computer software are not limited by this bill." (*Ibid.*, quoting H.R.Rep. No. 96-1307, pt. I, 96th Cong, 2d Sess. (1980) pp. 23-24.)

Third, the court reviewed the evolution of the Supreme Court's view of trade secret preemption in patent law. Two unfair competition cases from 1964 suggested an expanded federal law at the expense of state remedies. (See *Sears, Roebuck & Co.* v. *Stiffel Co.* (1964) 376 U.S. 225, 232-233 [11 L.Ed.2d 661, 667-668, 84 S.Ct. 784]; *Compco Corp.* v. *Day-Brite Lighting, Inc.* (1964) 376 U.S. 234, 237-238 [11 L.Ed.2d 669, 672-673, 84 S.Ct. 779].) In *Kewanee Oil Co.* v. *Bicron Corp., supra,* 416 U.S. 470, 479-480 [40 L.Ed.2d 315, 324-325], however, the court ruled that patent law does not preempt trade secret law. *Bryce* then concluded: "The Supreme Court in *Kewanee* has recognized the value of trade secrets. No significant opposition to this aspect of the *Kewanee* decision has been shown by Congress, particularly in view of the statutory evidence that Congress did not intend to preempt trade secret law. [¶] Since no 'unmistakable' indication has been given to the contrary by Congress and the weight of the evidence points to the recognition by Congress of the value of state protection of trade secrets, we conclude that state trade secret protection has not been preempted by the federal copyright laws." (*Bryce, supra,* 319 N.W.2d at p. 919.)

One factor distinguishes *Bryce*. Unlike *Real-Time* and *Brignoli, Bryce* arose under the 1906 Copyright Act. (319 N.W.2d at p. 913.) That act, however, has no express preemption clause equivalent to current section 301. (See Bender, *supra,* 47 U.Pitt.L.Rev. at p. 928, fn. 73.) Thus, its discussion of the 1976 and 1980 amendments is dicta. Nevertheless, its analysis is sound. It comports with the majority view and we adopt its reasoning.

We thus conclude that copyright does not preempt state claims based upon trade secret law. We turn to those cases involving breach of confidence. We initially note that the trade secret cases themselves suggest the lack of preemption in the breach of confidence cases. As outlined above, trade secrets cases frequently involve confidential relationships. (See, e.g., *Bryce, supra,* 319 N.W.2d at p. 915; Rest.1st Torts § 757.) Nevertheless, protection of trade secrets may arise even absent a confidential relationship.[32] We thus look to the cases discussing such relationships outside of the trade secret context.

"The law of confidential relationships governs duties of trust that one is not obligated to assume. Once a person commits himself to a confidential relationship, the law requires him to fulfill the duties attendant to the relationship. Confidential relations protects the *trust* that is implicit

---

[32] See *ante,* footnote 29.

in relationships between employers and employees, between masters and servants, and between principals and agents, rather than the *information that may pass between these parties.*" (Note, *Federal Copyright Protection and State Trade Secret Protection: The Case for Partial Preemption, supra,* 33 Am.U.L.Rev. 667, 687 [fns. omitted, italics in original].) The courts have generally found that actions for breach of a confidential relationship survive a copyright preemption challenge.

In addition to *Brignoli, supra,* 645 F.Supp. at pages 1205-1206, several other courts have refused to find such claims preempted. (*Walker* v. *Time-Life Films, supra,* 784 F.2d at p. 53 [while copyright preempted general "unfair competition" claim, no such preemption of breached confidential or fiduciary relationship claims; evidence, however, insufficient to find such latter claims]; *Ronald Litoff, Ltd.* v. *A. Kush & Assoc., Ltd.* (S.D.N.Y. 1985) 621 F.Supp. 981, 986; *P.I.T.S. Films* v. *Laconis* (E.D.Mich. 1984) 588 F.Supp. 1383, 1386; *Sargent* v. *American Greetings Corp.* (N.D.Ohio 1984) 588 F.Supp. 912, 923-924; *Smith* v. *Weinstein* (S.D.N.Y. 1984) 578 F.Supp. 1297, 1307; see also *Litchfield* v. *Spielberg* (9th Cir. 1984) 736 F.2d 1352, 1358 [state claim for misappropriation preempted but separate state claims for breach of confidential relationship dismissed without adjudication because no meritorious federal claim existed to which they could append]; *Mayer* v. *Josiah Wedgwood & Sons, Ltd.* (S.D.N.Y. 1985) 601 F.Supp. 1523, 15, 36 [breach of confidential relationship possibly not preempted].)

The discussion in these cases adds little to the analysis already discussed above in the trade secrets section. We see no basis for distinguishing the cases or the theory. ▮ Accordingly, we agree that copyright does not preempt a cause of action based on breach of confidence.

We turn to the breach of fiduciary duty cases. In *Del Madera Properties* v. *Rhodes and Gardner, Inc.* (9th Cir. 1987) 820 F.2d 973, 977, the Ninth Circuit held that copyright preempted an unfair competition claim based on an alleged breach of fiduciary duty. While partners with plaintiff, the defendants had allegedly misappropriated the plaintiff's time and effort in creating certain maps and documents. The court found that the breached fiduciary duty allegation "does not add any 'extra element' which changes the nature of the action. The argument is constructed upon the premise that the documents and information [one former partner] furnished to the defendants belonged to [plaintiff] and were misappropriated by the defendants. [Plaintiff's] ownership of this material, and the alleged misappropriation by the defendants, are part and parcel of the copyright claim. Thus, [plaintiff's] unfair competition claim for misappropriation of *its time and effort* expended in producing the . . . map and supporting documents is preempted." (*Ibid.*)

For several reasons, we distinguish *Del Madera.* First, the court cited no authority for its conclusion that copyright preempts a breach of fiduciary duty claim. In particular, the court completely ignored its earlier holding in *Oddo* v. *Ries* (9th Cir. 1984) 743 F.2d 630, 635. In that case, the court stated: "Oddo also claimed that Ries breached the fiduciary duty that Ries owed Oddo as a partner. Because a partner's duty to his co-partner is quite different from the interests preempted by copyright, this cause of action is also not preempted." (*Ibid.*)

Second, the *Del Madera* plaintiff's claim appeared to involve *only* the time and effort involved in creating the arguably copyrightable documents. Here, however, Balboa's alleged breach of fiduciary duty extends way beyond the unauthorized transfer of software enhancements. Given the broader allegations of breach, we do not find the claim preempted.

Several other courts have also concluded that a claim for breach of fiduciary duty survives copyright preemption. (See *Walker* v. *Time Life Films, supra,* 784 F.2d at p. 53; *Ronald Litoff Ltd.* v. *A. Kush & Assoc. Ltd., supra,* 621 F.Supp. at p. 986; *Werlin* v. *Reader's Digest Ass'n., Inc.* (S.D.N.Y. 1981) 528 F.Supp. 451, 464; see also *Rand McNally & Co.* v. *Fleet Management Systems, Inc.* (N.D.Ill. 1983) 591 F.Supp. 726, 739 [breach of fiduciary duty claim may avoid preemption]; cf. *Avco Corp.* v. *Precision Air Parts, Inc, supra,* 210 U.S.P.Q. (BNA) 894, 897-898 [trade secret claim preempted where complaint alleged no breach or trust or confidentiality].) Again, like the breach of confidentiality cases, these cases add little analytically to the "extra element" analysis.

We see little basis for distinguishing the breached fiduciary duty claims from the breached confidential relationship and trade secret claims. They all generally involve the extra element of an important relationship. The damages flow from the disruption of that relationship, in whatever form it occurs. Here, the alleged disruption involved numerous points beyond the software claims. Accordingly, we conclude that the breach of fiduciary duty claim survives preemption.

Finally, we turn to the common law misappropriation claim. This claim's vagueness has engendered various analyses. For example, in *Warner Bros.* v. *American Broadcasting Companies* (2d Cir. 1983) 720 F.2d 231, 247, the court stated unequivocally: "state law claims that rely on the misappropriation branch of unfair competition are preempted, [citations]." Nimmer generally concludes that misappropriation that "consisted simply of the acts of reproduction and distribution . . . undoubtedly constitutes a right 'within the general scope of copyright as specified by [17 U.S.C.S.] section 106.'" (1 Nimmer, *supra,* § 1.01[B][1] at p. 1-20.3; see also *id.* at pp. 1-20.5 to 1-20.6

[misappropriation by copying of musical tapes also preempted].)[33] At least one court, however, has found no preemption of misappropriation claims. (See *Sargent* v. *American Greetings Corp., supra*, 588 F.Supp. at p. 924.)

In the case before us, we conclude that Balboa has no common law misappropriation claim involving the software. Such a claim adds no extra element such as breach of fiduciary duty, breach of confidentiality or improper revelation of a trade secret. Absent the element of a relationship, a misappropriation claim for unauthorized use or transfer of the software adds nothing to a potential copyright infringement claim. Accordingly, copyright law preempts such a misappropriation claim.[34]

In summary, we conclude that, to the extent Balboa's complaint states claims for trade secret, breach of confidentiality and breach of fiduciary duty, it survives preemption.

## II.-IV.*

. . . . . . . . . . . . . . . . . . . . .

## V. *Disposition*

We reverse that portion of the trial court's judgment in favor of Barry Maashoff individually. We order judgment entered in favor of Balboa against Barry Maashoff individually for $3,721,000.[40] In all other respects, we affirm the court's judgment. Defendants and Barry Maashoff are ordered to assume Balboa's costs on appeal equally.

Evans, Acting P. J., and Marler, J., concurred.

A petition for a rehearing was denied April 20, 1990, and the petition of plaintiffs and appellants for review by the Supreme Court was denied June 7, 1990.

---

[33] Nimmer provides an extensive list of cases finding preemption of misappropriation type claims. (See *id.* at pp. 1-20.6 to 1-20.7, fn. 76.)

[34] Of course, to the extent the misappropriation claim does not involve Balboa's software modifications, it survives preemption. (See *Del Madera, supra*, 820 F.2d at pp. 976-977 [to extent defendants misappropriated effort spent producing noncopyrightable result, misappropriation claim survives preemption].)

* See footnote, *ante*, page 1327.

[40] Balboa does not argue that Maashoff should also share liability for the portion of the judgment involving the tracking system license sales to American Bankers and Trans Global. Accordingly, we limit direction of judgment to the damages for loss of the insurance accounts.